**LAW OFFICES OF RONALD A. MARRON**
RONALD A. MARRON (SBN 175650)
*ron@consumersadvocates.com*
ALEXIS M. WOOD (SBN 270200)
*alexis@consumersadvocates.com*
KAS L. GALLUCCI (SBN 288709)
*kas@consumersadvocates.com*
MICHAEL T. HOUCHIN (SBN 305541)
*mike@consumersadvocates.com*
LILACH HALPERIN (SBN 323202)
*lilach@consumersadvocates.com*
651 Arroyo Drive
San Diego, California 92103
Telephone: (619) 696-9006
Facsimile: (619) 564-6665

**LAW OFFICE OF DAVID ELLIOT**
DAVID ELLIOT (SBN 270381)
*davidelliot@elliotlawfirm.com*
2028 3rd Avenue
San Diego, CA 92101
Telephone: (858) 228-7997
*Attorneys for Plaintiffs and the Proposed Class*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BARRY ALLRED and MANDY C. ALLRED, on behalf of themselves, all others similarly situated, and the general public,<br><br>Plaintiffs,<br><br>vs.<br><br>FRITO-LAY NORTH AMERICA, INC., a Delaware corporation; and FRITO-LAY, INC., a Delaware corporation,<br><br>Defendants. | Case No.: 3:17-cv-01345-JLS-BGS<br><br>CLASS ACTION<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE EXPERT TESTIMONY, OPINIONS, AND REPORTS OF LASZLO P. SOMOGYI, GEORGE E. BELCH, AND CHARLENE L. PODLIPNA**<br><br>Date: April 4, 2019<br>Time: 1:30 p.m.<br>Ctrm: 4D<br>Judge: Hon. Janis L. Sammartino |

# **TABLE OF CONTENTS**

I.       INTRODUCTION ................................................................................1

II.      LEGAL STANDARDS ......................................................................4

III.     ARGUMENT......................................................................................5

  A.    THE COURT SHOULD NOT EXCLUDE THE TESTIMONY, OPINIONS, AND
      REPORT OFFERED BY DR. LASZLO P. SOMOGYI............................................5

    1.   *Dr. Somogyi's Opinions Are the Product of Reliable Principles and
        Methods*..................................................................................................5

    2.   *Dr. Somogyi is an Exceptionally Qualified Expert* ......................6

    3.   *The Opinions Documented in Dr. Somogyi's Report Are Helpful to the Trier
        of Fact* ....................................................................................................9

    4.   *Dr. Somogyi's Opinions Are Based on Sufficient Facts* ...........11

  B.    DR. BELCH'S SURVEY METHODOLOGY IS SOUND AND DEFENDANTS'
  TECHNICAL CRITIQUES ARE MERITLESS....................................................12

    1.   *Dr. Belch's Survey Used an Appropriate Control* ....................12

    2.   *Dr. Belch Used a Proper Survey Structure* ...............................14

    3.   *Dr. Belch's Survey Is Based on Sufficient Facts and Data*.......16

    4.   *Dr. Belch's Conclusions Are Helpful to the Trier of Fact*........17

  C.    DEFENDANTS' CRITIQUES OF CHARLENE PODLIPNA'S REPORT ARE
  SIMILARLY CONCOCTED OUT OF COUNTER-FACTUAL ASSUMPTIONS AND ARE
  LEGALLY MERITLESS................................................................................19

    1.   *Ms. Podlipna's Opinions Are Procedurally and Scientifically Sound and
        Independent and are Based on Well-Accepted Economic Methodology*...19

    2.   *Defendants Ignore Two Out Of Three Independent Case Analyses
        Performed and the Resulting Conclusions Provided By Ms. Podlipna In
        Order to Claim That Her Report is Somehow Incomplete* ........................19

    3.   *Defendants' "Supply-Side" Damages Model Argument is Simply An
        Argument In Favor Of A Damages Model Defendants Prefer* .................20

ii

*Allred v. Frito-Lay North America, Inc., et al.*, Case No. 3:17-cv-01345-JLS-BGS
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'
OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY

4.   *Ms. Podlipna's Factual Assumption That All of The Products During The Proposed Class Period Were Labeled Unlawfully Is Correct* .................22

IV.      CONCLUSION..............................................................................................23

*Allred v. Frito-Lay North America, Inc., et al.*, Case No. 3:17-cv-01345-JLS-BGS
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'
OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY

# TABLE OF AUTHORITIES

**Cases**

*Apple v. Samsung*,

2014 U.S. Dist. LEXIS 29721 (N.D. Cal. Mar. 6, 2014) ....................................20

*City of Pomona v. SQM N. Am. Corp.*,

750 F.3d 1036 (9th Cir. 2014) ..................................................................4

*Classic Foods Int'l Corp. v. Kettle Foods, Inc.*,

2006 U.S. Dist. LEXIS 97200 (C.D. Cal. 2006) ..................................................15

*Clicks Billiards, Inc. v. Sixshooters Inc.*,

251 F.3d 1252 (9th Cir. 2001) ..............................................................3, 13

*Daubert v. Merrell Dow Pharm., Inc.*,

43 F.3d 1311 (9th Cir. 1995) ...............................................................2, 4

*Daubert v. Merrell Dow Pharm., Inc.*,

509 U.S. 579 (1993) ............................................................................9

*E. & J. Gallo Winery v. Gallo Cattle Co.*,

967 F.2d 1280 (9th Cir. 1992) ..............................................................10

*Frye v. Ayers*,

2009 WL 1312924 (E.D. Cal. May 12, 2009) ..................................................4

*Gen. Elec. Co. v. Joiner*,

522 U.S. 136 (1997) ............................................................................8

*Hilsley v. Ocean Spray Cranberries, Inc.*,

2018 WL 6300479 (S.D. Cal. Nov. 29, 2018) ..................................................22

*Primiano v. Cook*,

598 F.3d 558 (9th Cir. 2010) ...................................................................9

*Prudential Ins. Co. of Am. v. Gibraltar Fin. Corp.*,

694 F.2d 1150 (9th Cir. 1982) ...............................................................15

*Ruiz v. XPO Last Mile, Inc.*,

2017 WL 2263046 (S.D. Cal. May 23, 2017) .............................................4, 23

iv

*United States v. Sandoval-Mendoza*,
  472 F.3d 645 (9th Cir. 2006) ..................................................5, 9

*Wendt v. Host Int'l*,
  125 F.3d 806 (9th Cir. 1997) ...................................................15

*Zakaria v. Gerber Prods. Co.*,
  2018 U.S. App. LEXIS 32240 (9th Cir. 2018) ....................................21

**Rules**

Fed. R. Evid. 702 .........................................................4, 15

Fed. R. Evid. 702(a) ............................................................9

**Regulations**

21 C.F.R § 101.22(i)(3) .........................................................13

21 C.F.R § 184.1069(a) ...........................................................1

21 C.F.R. § 101.22 ...............................................................22

21 C.F.R. § 101.22(i)(2) ........................................................13

Cal. Health & Safety Code §§ 109875, *et seq.* ..................................22

**Treatises**

6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* (2013)
  § 32:170 ....................................................................3

*Allred v. Frito-Lay North America, Inc., et al.*, Case No. 3:17-cv-01345-JLS-BGS
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'
OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY

Plaintiffs Barry Allred and Mandy C. Allred ("Plaintiffs"), on behalf of themselves, all others similarly situated, and the general public, file this Memorandum of Points and Authorities in Support of their Opposition to Defendants Frito-Lay North America, Inc. and Frito-Lay, Inc.'s ("Defendants") Motion to Exclude the Testimony, Opinions, and Reports of Laszlo P. Somogyi, George E. Belch, and Charlene L. Podlipna ("Motion" or "Mot.") that was filed on January 31, 2019. (Dkt. No. 94). For the reasons set forth below, Defendants' Motion should be denied in its entirety.

## I.  INTRODUCTION

Facts matter, in Defendants' Motion as in this case. Defendants add the ingredient dl-malic acid to their Product but advertise that the Product contains "No Artificial Flavors." (*See generally* First Amended Complaint ("FAC"), Dkt. No. 61). Two fundamental factual liability questions are therefore before the Court, pertinent to Defendants' Motion:

1. Is dl-malic acid an artificial flavor? and,

2. Does dl-malic acid function as an artificial flavor in the Product?

If the answer to both these questions is "yes," then Defendants' advertising is false and Defendants have violated California law. The two questions that then follow, solely regarding damages, are:

3. Does Defendants' false advertising and failure to legally disclose the artificial flavoring influence consumers? and, if so,

4. By how much were consumers defrauded, in dollars and cents?

Defendants do not contest the first liability question, as they cannot:  the U.S. FDA expressly states in federal regulation that dl-malic acid is an artificial chemical.[1] *See* 21 C.F.R § 184.1069(a). Defendants' liability therefore comes down to Question 2:  does dl-malic acid function as an artificial flavor in the Product?

---

[1] Dl-malic acid is manufactured in petrochemical factories from either benzene or butane. (FAC ¶ 30).

1

Defendants seek to preclude all the expert testimony of all of Plaintiffs' experts – Dr. Laszlo P. Somogyi, Dr. George E. Belch, and Charlene L. Podlipna. Defendants' attacks on Plaintiffs' experts and their criticisms of the experts' surveys and reports have no merit. Contrary to Defendants' claims, all three experts are highly regarded and experienced professionals who have provided conventional Reports following well-established and generally accepted principles. Other than over-blown rhetoric, Defendants offer nothing but the types of technical criticisms the Ninth Circuit and other courts have repeatedly held go to the weight of testimony, not its admissibility.

Drawing on his fifty plus years of experience as a flavor expert in the food industry, working for manufacturers, consulting firms, and for the federal government, Dr. Somogyi's expert report and testimony is well-suited to help the trier of fact answer this second question, and his methods are both scientific and well-matched to this task. Defendants' own expert agrees. *See* Dkt. No. 94-7, Marianne Gillette's Expert Report ("Gillette Report") at ¶¶ 44-75.  Defendants' small-minded complaints about the form of Dr. Somogyi's report (typographic error) and his methods, which their own expert recommends, cannot dispute this. Dr Somogyi's opinion "speaks clearly and directly to an issue in dispute in the case," *Daubert v. Merrell Dow Pharm., Inc.,* 43 F.3d 1311, 1321 n. 17 (9th Cir. 1995) ("*Daubert II*"), and "will not mislead the jury" because it is both factually accurate and based on scientifically validated, accurate, industry-standard methods and peer-reviewed science. *Id.* Defendants have, whether deliberately or inadvertently, completely misinterpreted Dr. Somogyi's study, as explained in detail *infra*. Finally, Dr. Somogyi's extensive scientific, technical, and specialized knowledge will help the trier of fact to understand the evidence and to determine an important fact in issue—namely, that the artificial dl-malic acid that Defendants add to the Product is an artificial flavor and functions as an artificial flavor.

Regarding the second set of questions directed at damages, which Plaintiffs' two experts addressed in their reports, Defendants again advance only hyper-technical and quibbling arguments to attempt to exclude the experts' testimony. Dr. George E. Belch

("Dr. Belch") is more than qualified to opine as to consumer purchasing decisions, as illustrated throughout his extensive Curriculum Vitae ("CV"). *See* Declaration of Ronald A. Marron in Support of Plaintiffs' Opposition to Defendants' Motion to Exclude Expert Testimony filed concurrently herewith ("Marron Decl."), ¶ 4 & Ex. 3 [Dr. Belch Rpt.]. Defendants' motion attacks every minute, technical issue of Dr. Belch's survey and report around which they can muster an argument. However, courts generally and especially in the Ninth Circuit, which Defendants largely ignore, have made abundantly clear that "once a survey has passed the threshold criteria of having a proper foundation, being relevant, and having been conducted according to accepted principles" it can be admitted into evidence and any follow-on technical critiques are left for the trier of fact to weigh when considering the survey's impact on the ultimate question of likelihood of confusion. 6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* (2013) § 32:170 (citing cases); *Clicks Billiards, Inc. v. Sixshooters Inc*., 251 F.3d 1252, 1262–63 (9th Cir. 2001) ("Once the survey is admitted, however, follow-on issues of methodology, survey design, reliability, critique of conclusions and the like go to the weight of the survey rather than its admissibility."). Dr. Belch used a well-accepted survey format according to accepted survey principles when designing and conducting his survey.

Lastly, Charlene L. Podlipna, CPA ("Ms. Podlipna") contributed significant expertise and independent analysis, contrary to Defendants' thinly-veiled and overtly insulting disparagement of her work. None of Defendants' arguments here go to the admissibility of Plaintiffs' experts' opinions, only to their evidentiary weight. Defendants are entitled to cross-examine Plaintiffs' experts at trial and to introduce their own experts' competing theories, and that is the appropriate time to make these arguments. Because Defendants' arguments solely and improperly address only the evidentiary weight of the Reports, not their admissibility, Defendants' Motion to Exclude is misplaced and should be denied.

3

## II. LEGAL STANDARDS

"A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case."

Fed. R. Evid. 702.

In ruling on the admissibility of expert scientific testimony, "[the court] must engage in a difficult, two-part analysis." *Daubert II*, 43 F.3d at 1315. First, the court must determine "whether the experts' testimony reflects 'scientific knowledge,' whether their findings are 'derived by the scientific method,' and whether their work product amounts to 'good science.'" *Id.* "[The court's] task, then, is to analyze not what the experts say, but what basis they have for saying it." *Id.* at 1316. In other words, "the test under *Daubert* is not the correctness of the expert's conclusions, but the soundness of his methodology." *Id.* at 1318. "Second, [the court] must ensure that the proposed expert testimony is 'relevant to the task at hand,' . . . i.e., that it logically advances a material aspect of the proposing party's case." *Id.* at 1315.

"This inquiry is designed to be a flexible one, and '[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion.'" *Ruiz v. XPO Last Mile, Inc.*, No. 5CV2125 JLS (KSC), 2017 WL 2263046, at *2 (S.D. Cal. May 23, 2017) (citing *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014)). "[R]ejection of expert testimony is the exception rather than the rule." *Id.* (quoting *Frye v. Ayers*, No. CIVS990628LKKKJM, 2009 WL 1312924, at *4 (E.D. Cal. May 12, 2009)).

### III.    ARGUMENT

**A. The Court Should Not Exclude The Testimony, Opinions, And Report Offered By Dr. Laszlo P. Somogyi**

    *1.   Dr. Somogyi's Opinions Are the Product of Reliable Principles and Methods*

Defendants argue that Dr. Somogyi's expert testimony must be excluded because "Dr. Somogyi's own tasting of the chips … is not based on any scientifically reliable principles or methods…" *See* Mot. at 6:1-3. Defendants' argument is patently disingenuous – Defendants own expert contradicts this argument in her report. She applies and justifies the same 'taste-testing' methodology Defendants rail against in Dr. Somogyi's testimony. Defendants' expert, Marianne H. Gillette, explains in her Report that "[o]ne reliable, science-based way to determine the function of malic acid in a food product is through sensory evaluation." Gillette Report ¶ 44. Ms. Gillette goes on to explain, "[s]ensory evaluation is an established practice in the consumer products (food, beverage …) industry" and "[t]oday, sensory science is an essential component in university Food Science degree programs..." Gillette Report ¶¶ 44, 46. Ms. Gillette reports that she "tasted the control and test samples of Lay's Salt & Vinegar Flavored Potato Chips" and that her "own taste testing [allegedly] confirms that malic acid does not impart a characterizing vinegar flavor to the Product." Gillette Report ¶ 75. Defendants' expert Marianne Gillette's opinions regarding sensory evaluation – one of the methods Dr. Somogyi employed in determining the function of malic acid – directly contradict Defendants' assertion that Dr. Somogyi's method is unsupported by scientific principles. Further, "[e]xpert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry." *United States v. Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006). Here, both Plaintiffs' and Defendants' experts rely on the sensory evaluation method to determine a core issue in the case. Dr. Somogyi's testimony contradicts that of Defendants' expert, and thus will be helpful in assisting the trier of fact in understanding this key issue in the case.

Additionally, the fact that Dr. Somogyi did not specifically state in his Report the fact that he had tasted the Product to confirm his well-founded scientific opinion is not grounds to exclude the report. Dr. Somogyi has been in the field for 50 years and testified that tasting of the Product is so "obvious" that he did not even think to put it in the Report. *See* Marron Decl. ¶ 3 & Ex. 2 [Somogyi Dep. Tr. at 61:11 – 32:2]. As a qualified food scientist who has worked in this field for over 50 years, it is not surprising that Dr. Somogyi is "familiar with the taste of malic acid." *Id*. at 56:15-18. As Dr. Somogyi testified during his deposition, malic acid "has a very typical sharp effect when you taste [it]" and "if you are trained in flavor chemistry, you certainly recognize it." *See* Marron Decl. ¶ 3 & Ex. 2 [Somogyi Dep. Tr. 57:3-9]. Indeed, all the publications and sources cited by Dr. Somogyi in his report confirm this very fact. *See* Marron Decl. ¶ 2, Ex. 1 [Somogyi Expert Report].

Further, Dr. Somogyi's personal tasting of the Product, which he informed Defendants of in his deposition, is obviously not the only scientific method he used to form his expert opinion. In his report, Dr. Somogyi lists the possible functions of malic acid, as Defendants concede (Mot. at 5:5-6). However, contrary to Defendants' assertion that Dr. Somogyi does not then address whether malic acid serves as a flavor or flavor enhancer, Dr. Somogyi rules out all functions of malic acid besides as a flavoring agent. *See* Marron Decl. ¶ 2 & Ex. 1 [Somogyi Report ¶¶ 37-55]. Further, Dr. Somogyi's Report is replete with citations to authority from numerous scientific and industry sources all supporting his conclusion that malic acid is used as a flavoring ingredient. *See generally*, *id*.

### 2.   *Dr. Somogyi is an Exceptionally Qualified Expert*

The *Daubert* analysis begins with the credentials and experience of the expert whose work is under scrutiny. Defendants argue that Dr. Somogyi's testimony should be excluded because he "has *no academic training in or professional experience* with food-labeling regulatory compliance issues." Mot. at 10:5-7 (original emphasis). This assertion, however, is both completely false and beside the point. Contrary to Defendants'

6

*Allred v. Frito-Lay North America, Inc., et al.,* Case No. 3:17-cv-01345-JLS-BGS
Memorandum of Points and Authorities in Support of Plaintiffs' Opposition to
Defendants' Motion to Exclude Expert Testimony

assertion, Dr. Somogyi's CV illustrates his extensive experience as a senior food scientist for the Stanford Research Institute (SRI), food technology research scientist at the University of California at Davis, consulting contractor for the FDA Office of Food Additive Safety, and food processing researcher and consultant for the Food and Drug Administration (FDA), the Environmental Protection Agency (EPA) and over 50 leading food companies. *See* Marron Decl. ¶ 2, Ex. 1 [Somogyi Report at ¶ 12-18]. Dr. Somogyi holds a Ph.D. in Food Science at Rutgers University, a Master's of Science degree in Plant Physiology at Rutgers University and a Bachelor of Science degree in Horticulture at Corvinus University in Budapest, Hungary. *See* Marron Decl. ¶ 2, Ex. 1 [Somogyi Report at ¶ 13]. Further, Dr. Somogyi has worked in this field for 50 years, his work is documented and published in over fifty scientific papers in referred professional publications, and he has co-authored academic textbooks and scientific encyclopedia entries. *See* Marron Decl. ¶ 2, Ex. 1 [Somogyi Report at ¶ 19-20].

Defendants misrepresent this illustrious career with the absurd claim that Dr. Somogyi's "sole education in food regulatory compliance was 'an evening extension course' completed 'a long time ago…'" Mot. at 10:15-18. Dr. Somogyi explained during his deposition that all basic food science courses include a general review of food labeling regulations. *See* Marron Decl. ¶ 3, Ex. 2 [Somogyi Dep. Tr. 70:7-13]. Further, while Dr. Somogyi completed his education in the 1960s, he testified that he has attended symposia yearly since 1964 conducted by the Institute of Food Technologies to keep up with any changes in the field. *Id*. at 70:22 – 71:10. Further, as Dr. Somogyi testified, food technology research encompasses food regulations, as all food scientists must be familiar with the relevant regulations, the regulatory status of ingredients, and how the ingredients are used. *Id*. at 72:12-17. Dr. Somogyi's work in product development throughout his career required him to make sure that products complied with the relevant regulations. *Id*. at 72:20 – 73:9. Defendants ignore the academic training Dr. Somogyi reported on, his extensive continuing education, and an entire 50-year career's-worth of hands-on

regulatory experience to try to discredit Dr. Somogyi's qualifications. Defendants' misleading arguments are unavailing.

Defendants further nit-pick Dr. Somogyi's deposition testimony to assert that he "had no idea 'what NLEA stand for.'" Mot. at 11:3-8. The NLEA, however, is legal jargon for an amendment to a statute. Food science experts are not required to recall at all times what every legal acronym stands for. This is a specious argument for exclusion. Further, Defendants fail to add that they asked Dr. Somogyi a long list of questions in addition to the statutory definition of the NLEA, such as what WONF stands for and what a characterizing flavor is, and that Dr. Somogyi answered all of these thoroughly and accurately. *See* Marron Decl. ¶ 3, Ex. 2 [Somogyi Dep. Tr. at 65:21 – 66:9; 67:17 – 68:7]. Defendants' myopic focus on one abbreviation is simply another misleading attempt to discredit Dr. Somogyi.

Defendants further distort Dr. Somogyi's testimony that malic acid provides a "fruity" flavor to say that because malic acid provides a fruity flavor, it cannot provide a vinegar flavor. To the contrary, Dr. Somogyi testified at his deposition that malic acid not only provides a "fruity" flavor," but provides a "tart" flavor to food and beverage products. *See* Marron Decl. ¶ 3, Ex. 2 [Somogyi Dep. Tr. at 30:22 – 31:23]. This is the flavor that malic acid, which the U.S. FDA acknowledges will function as a flavoring agent, provides:  a "tart" fruity flavor.[2] Not to mention, this Court has already ruled that "the fact that malic acid simulates multiple flavors is not mutually exclusive with the fact that malic acid imparts a vinegar flavor in the Product." *See* Dkt. No. 104 at 8:13 – 9:3.

Defendants' Motion fails on the merits, both factually and procedurally. District court judges have broad discretion in deciding whether to admit or exclude expert testimony pursuant to Federal Rule of Evidence 702. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141-42 (1997). Expert testimony is admissible under Rule 702 if the expert's

---

[2] Malic acid "contributes to the sour taste of green apples. . . ." Kunisuke Izawa, ... Motonaka Kuroda, in Comprehensive Natural Products II, 2010; cited in Science Direct, 4.16.7.2.2 Malic acid, *available at* https://www.sciencedirect.com/topics/biochemistry-genetics-and-molecular-biology/malic-acid (last visited March 6, 2019).

scientific, technical, or other specialized knowledge "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Under this standard, "rejection of expert testimony is the exception rather than the rule." Committee Notes on Fed. R. Evid. 702—2000 Amendment. A court's gatekeeping role regarding expert testimony is not intended to serve as a replacement for cross-examination. As stated in the Committee Notes for Rule 702, "[v]igorous cross-examination, presentations of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking" most expert witnesses. Fed. R. Evid. 702, Adv. Comm. Notes (2000); *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 596, (1993); *Primiano v. Cook*, 598 F.3d 558, 568 (9th Cir. 2010) ("judge is a gatekeeper, not a fact finder" and "gate could not be closed to … relevant opinion offered with sufficient foundation by one qualified to give it") (internal quotes omitted).

Defendants' Motion ignores not only the broad standard for admissibility of expert evidence, but also the facts at issue and their own proffered expert's opinions. Dr. Somogyi's expert testimony, based on his illustrious career and accepted scientific methodology, is source-cited and consistent with both industry-standard knowledge and the U.S. FDA's regulations regarding malic acid. His opinions are factually correct and helpful to the trier of fact. Defendants raise no valid grounds to exclude his testimony. *See United States v. Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006) ("Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry.").

3.    *The Opinions Documented in Dr. Somogyi's Report Are Helpful to the Trier of Fact*

Defendants argue that the Court must exclude Dr. Somogyi's testimony because, Defendants claim, it is not reliable or helpful. Defendants are mistaken. Dr. Somogyi's expert opinion, which is both reliable and helpful to the trier of fact, is admissible to challenge Defendants' false contentions regarding the function of dl-malic acid in the Product.

Foremost among all of Defendants' spurious reasons, Defendants seek to exclude the expert report of Dr. Somogyi's Report because the Report contains some typos. *See* Mot. at 7. This is exactly the kind of "technical" criticism that the Ninth Circuit has rejected as grounds to exclude expert testimony. *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1292 (9th Cir. 1992) ("[I]t is routine to admit a relevant survey; and technical unreliability goes to weight, not admissibility."). Defendants cannot attack Dr. Somogyi's credentials directly as his qualifications are unimpeachable, so they resort to criticism of minor typographic errors.

Defendants would have the Court believe Dr. Somogyi is careless and failed to spend adequate time doing his job. This portrayal is false, however, and is a transparent attempt to distract from Dr. Somogyi's actual opinions. Dr. Somogyi testified to the accidental typing error of including the word "beverage" in the Report and explained, understandably, that the error was due in part to "working simultaneously [on] some beverage issues completely different from this, so that my mind just didn't switch." *See* Marron Decl. ¶ 3, Ex. 2 [Somogyi Dep. Tr. at 47:11-22]. Defendants further contend "Dr. Somogyi admitted it was 'possible' he copies and pasted his work…" Mot. at 7:13-15. This misconstrues Dr. Somogyi's testimony, however, which shows that Dr. Somogyi was working on two projects simultaneously, and when asked if it was possible that he copied and pasted part of his work from each assignment, he answered "***Unlikely*** but possible, yes." *See* Marron Decl. ¶ 3, Ex. 2 [Somogyi Dep. Tr. 48:7-13] (emphasis added).

These charges of hyper-technical deficiencies fail to address the undeniable reality that Dr. Somogyi is qualified and his opinions are meritorious. Defendants' own allegations and proffered expert testimony reveal that Dr. Somogyi's testimony regarding the flavor and function of dl-malic acid in the Products will assist the trier of fact in understanding key issues in the case. Dr. Somogyi's opinion that the dl-malic acid functions as a flavor contradicts Defendants' assertion that the malic acid functions only as a flavor enhancer. Dr. Somogyi's testimony is reliable and relevant because he has

spent years analyzing scientific studies of food ingredients such as malic acid. Dr. Somogyi's testimony is clearly relevant and directly responsive to Defendants' assertions and the scope of their experts' testimony. To the extent Defendants take issue with Dr. Somogyi's testimony as it pertains to the Product, they are entitled to raise this during cross-examination. Because there is no basis for exclusion, Defendants' Motion must be denied.

### 4.    *Dr. Somogyi's Opinions Are Based on Sufficient Facts*

Defendants contend that Dr. Somogyi failed to "examine the Product at issue." This however, is patently false. When asked during his deposition "how many labels of Lay's Salt & Vinegar Potato Chips did you review," Dr. Somogyi testified "I would say not more than five." *See* Marron Decl. ¶ 3, Ex. 2 [Somogyi Dep. Tr. at 16:13-21]. Then, Dr. Somogyi testified that he "believe[d]" the content was 3 and a half ounces. *Id*. at 22-24. That he estimated the size incorrectly does not mean that he did not review the Product. In fact, Dr. Somogyi goes on to testify that he reviewed the ingredient list, nutrition information, and net weight on the Product bags he reviewed *Id*. at 17:9-25. Further, when asked "[s]o is it fair to say that you reviewed generally the packaging of the bags you reviewed?" Dr. Somogyi answered, "Yes." *Id*. at 18:6-9. Not to mention, Dr. Somogyi explains that he even tasted the Product at issue. *Id*. at 19:16-23. Thus, Defendants' assertion that Dr. Somogyi never examined the Product at issue is entirely false.

Defendants also attempt to attack Dr. Somogyi's methodology by introducing the results of a sensory testing panel that Defendants' expert commissioned. A close examination of the sensory panel's testing, as described in Defendants' expert report, however, shows that Defendants' expert tested every conceivable sensory aspect of the Products ***except*** for the one aspect that is relevant to this case under Federal and California law:  does the flavor of dl-malic acid resemble the flavor of vinegar? *See* 21 CFR 101.22. If it does, dl-malic acid is an artificial flavor in these Products under Federal law and, by incorporation by reference, under California's Sherman law as well. Whether

deliberately or inadvertently, the sensory panel testing that Defendants orchestrated carefully avoided producing <u>any</u> data on the specific dispositive question before the Court. The Court may note also that Defendants' sensory testing apparently did not actually test the Product with the malic acid simply removed from the Product but in fact replaced the removed malic acid with additional "vinegar flavor" powder. Gillette Report ¶¶ 44-75.

**B. Dr. Belch's Survey Methodology Is Sound and Defendants' Technical Critiques Are Meritless**

1. *Dr. Belch's Survey Used an Appropriate Control*

Defendants' critique of Dr. Belch's expert report is similarly without merit. In considering marketing studies and surveys, due to the practically unlimited number of potential stimuli from which to choose, experts often and predictably disagree on the appropriateness of a control stimulus; such common disagreements only concern issues of weight, not admissibility. Experts frequently criticize the control stimulus chosen by their opposition. Indeed, while Defendants' expert, Dr. Kivetz, disagrees with Dr. Belch's control, Dr. Belch also criticizes Dr. Kivetz' control. This should come as no surprise. What is surprising is that Defendants' counsel would attempt to elevate these common technical areas of disagreement by including them in a *Daubert* motion. *Daubert* challenges to surveys are limited to the rare situations in which the "proffered survey is so flawed as to be completely unhelpful to the trier of fact." *PBM Prods.*, 639 F.3d at 123. Defendants' commonplace and hyper-technical critique of an opposing expert's control stimulus comes nowhere close to an appropriate *Daubert* challenge. *Id*.

Defendants criticize Dr. Belch's survey for "draw[ing] attention to the label claims being litigated in this case." Mot. at 16:5-7. However, the Product packaging used in the survey retains all existing package features except the challenged one, namely the artificially-flavored designation. This was an appropriate control precisely because it allowed Dr. Belch to "determine what the impact of [the] disclosure would be." *See* Marron Decl. ¶ 7, Ex. 6 [Belch Dep. Tr. 106:5-6]. As Dr. Belch described during his

12

*Allred v. Frito-Lay North America, Inc., et al.,* CASE NO. 3:17-CV-01345-JLS-BGS
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY

deposition, "another fundamental principle of experimental design is to ensure that you have a manipulation check to determine that the variable [of] interest was noticed by the consumer. Otherwise you – you're just comparing apples to apples again." *Id*. at 110:5-9. For example, Dr. Belch pointed to Dr. Kivetz' study "where he manipulated the package and has no idea if anyone ever saw it. He compared apples to apples. He gave the test group a package and has no idea if anyone noticed anything." *Id*. at 105:21 – 106:1. As Dr. Belch made clear in his testimony, it is impossible to determine whether consumers care about whether a product is artificially flavored if they do not know that the product is artificially flavored. Defendants' expert's technical disagreement with Dr. Belch as to the effectiveness of Dr. Belch's control is not grounds for dismissing his survey or his conclusions therefrom. *See Clicks Billiards*, 251 F.3d at 1263.

Defendants also misleadingly argue that Dr. Belch modified the "color and size" of the challenged disclosure "to steer respondents toward the result Plaintiffs' counsel wanted." Mot. at 15:15-16. This is not the case. As Dr. Belch explained during his deposition, the federal regulations regarding food labeling require that products disclose the use of artificial flavoring in a manner that is "conspicuous" and noticeable by consumers. *See* Code of Federal Regulations 21 C.F.R § 101.22(i)(3) ("the words prescribed by this paragraph shall immediately and conspicuously precede or follow [the name of the characterizing flavor]"). Further, the regulations require that the disclosure be "at least half" the size of the characterizing flavor. *See* Marron Decl. ¶ 7, Ex. 6 [Belch Dep. Tr. at 35:22 – 36:3]; *see also* Code of Federal Regulations 21 C.F.R. § 101.22(i)(2) ("the name of the characterizing flavor shall be accompanied by the word(s) 'artificial' or 'artificially flavored', in letters not less than one-half the height of the letters in the name of the characterizing flavor").

Finally, Defendants argue that "no snack food company" would advertise the "artificially flavored" disclosure on their products the way that the survey questions do. This, in fact, supports Plaintiffs' position and Dr. Belch's conclusions: reasonable consumers find the inclusion of artificial flavoring ingredients material, and this is why

food companies try to make the legally-required "artificially flavored" disclosure as inconspicuous as the federal regulations permit. As Defendants' counsel explained at Dr. Belch's deposition, no snack company would "want to call out a potentially perceived negative." *See* Marron Decl. ¶ 7, Ex. 6 [Belch Dep. Tr. 124:11-12; 125:1-9 (Q: would you advise Frito-Lay … to include a checkmark that says "contains artificial ingredients" on the back of the pack? A: Well, as a marketing consultant, I probably wouldn't… Q: And what would the reason for that be? A: Well, it could lead to negative consumer perceptions of the product."). The test packaging was appropriately used by Dr. Belch as a representative example of what would be an adequate legally-required disclosure that would alert consumers to this crucial Product attribute. The fact that the legally-accurate product package might differ from the way Frito-Lay currently unlawfully advertises the Product, or may in the future decide to advertise a legally-compliant Product, has no impact on the admissibility of Dr. Belch's survey which provides the trier of fact with useful information.

### 2.    *Dr. Belch Used a Proper Survey Structure*

Defendants criticize Dr. Belch's survey for supposedly violating market conditions. The bulk of Defendants' "marketplace conditions" arguments hinge on what Defendants argue was an "improper" focus on the artificially flavored disclosure. However, as described above, the survey questions regarding artificial flavoring were necessary for the survey as a manipulation check. Because the survey was designed to measure the impact the use of artificial flavoring ingredients has on consumer purchasing decisions, Dr. Belch needed to make sure that respondents noticed that the Product was artificially flavored and then provide opinions on that fact. Defendants zero in on the questions relating to artificial flavors as negative attributes, but the purpose of the survey was to determine the effect of an artificially flavored disclosure on the Product labels.

Defendants further argue that the survey's sequence of the questions "primed" consumers to think about artificial flavors. Mot. at 18-19. However, as Dr. Belch explains, the sequencing of the questions were the same in both the control and test

groups. Accordingly, if Defendants argue that consumers in the test group were primed to think about artificial flavors, then consumers in the control group also "were primed" to think about the fact that the product has no artificial flavors. *See* Marron Decl. ¶ 7, Ex. 6 [Belch Dep. Tr. at 134:17-24]. Because the same conditions existed for each group, the "effect should have been equal across both conditions" negating any potential bias. *Id*. This again provides useful information for the trier of fact (Fed. R. Evid. 702) and Defendants' contention that their expert would do things differently is not proper grounds for their *Daubert* contention.

Defendants disagree with Dr. Belch's conclusions, which they are certainly entitled to do but which also is not the proper focus of a *Daubert* inquiry. *Daubert, supra* at 595. Any battle between the parties' experts regarding proper survey design clearly goes to the weight of Dr. Belch's survey, not its admissibility. *See Classic Foods Int'l Corp. v. Kettle Foods, Inc*., 2006 U.S. Dist. LEXIS 97200, *10 (C.D. Cal. 2006) ("[A]ny deficiencies in the survey's methodology are properly addressed by cross-examination at trial rather than outright exclusion."); *Wendt v. Host Int'l*, 125 F.3d 806, 814 (9th Cir. 1997) ("Challenges to survey methodology go to the weight given the survey, not its admissibility") (citing *Prudential Ins. Co. of Am. v. Gibraltar Fin. Corp*., 694 F.2d 1150, 1156 (9th Cir. 1982)).

Lastly, Defendants misconstrue Dr. Belch's deposition testimony to argue that the survey did not replicate market conditions because "no one would approach a consumer to ask them to rate a product while they decide whether to purchase it." Mot. at 18:2-5 (original citations omitted). However, to follow this argument to its logical conclusion, Defendants would effectively require that Dr. Belch's survey asked no questions at all, since consumers are never asked questions regarding products in physical marketplaces. This argument is unreasonable and unobtainable in the real world. The conditions under which Defendants argue the survey should be performed would effectively amount to a rejection of all surveys, since no survey can perfectly reproduce the actual market in which the customer makes his or her purchasing decision. As explained in Dr. Kivetz'

Rebuttal Report, a survey designer should try to "*approximate*" marketplace conditions. *See* ECF No. 94-10, Dr. Kivetz Rebuttal Report ¶ 16. Dr. Belch's survey appropriately approximates marketplace conditions as required to explore the relevant Product advertising attributes had Defendant used legally compliant packaging.[3] Defendants' motion should be denied.

Defendants also attempt to use the survey response data for the Garden of Eatin' product questions to undermine the response data from Dr. Belch's survey of the Product. However, "questions regarding the use of artificial flavors were not used for [the] Garden of Eatin' product." *See* Marron Decl. ¶ 4, Ex. 3 [Belch Report ¶ 21]. The response data from the Garden of Eatin' questions simply do not apply to Dr. Belch's analyses of the response data regarding the Product.

### 3.   *Dr. Belch's Survey Is Based on Sufficient Facts and Data*

Defendants argue that Dr. Belch's survey contained no instructions telling participants to avoid guessing behavior. However, while Dr. Belch did not employ this specific instruction, he used other equally effective screening methods that would achieve the same result for his survey. For example, Dr. Belch used filter questions leading up to participants' eligibility to participate in the survey. If a respondent didn't meet the screening questions, they were omitted from the survey. More specifically, in order to qualify for participation in the survey, respondents had to indicate that they had purchased Lay's Salt & Vinegar potato chips in the past six months. *See* Marron Decl. ¶ 4, Ex. 3 [Belch Report ¶ 14]. Furthermore, the survey was administered to an online panel of consumers maintained by Luth Research, a leading market research firm, which filtered out non-responsive participants. *See* Marron Decl. ¶ 7, Ex. 6 [Belch Dep. Tr. 50:17-23; 53:25 – 54:4 (Q: And was there any attempt to assess respondents'

---

[3] Defendants characterize Dr. Belch's control packaging as "visually unappealing" and "commercially unviable." Mot. at 14:21. Defendants' supposed "visually unappealing" packaging is actually legally required, Plaintiffs contend, to make the package comply with federal regulations and California law. *See* Code of Federal Regulations 21 CFR 101.22.

*Allred v. Frito-Lay North America, Inc., et al.,* Case No. 3:17-cv-01345-JLS-BGS
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY

involvement level with the survey? A: Yes. That's done by the research company. … A: "[t]he survey company explained to me that what they do as part of their quality checking, they would determine whether the individual spent a very short time period, and then that would not be considered a valid response.)]. Defendants' contention concerning Dr. Belch's survey instructions is erroneous and fails to impact the survey's admissibility.

Furthermore, Defendants argue that Dr. Belch improperly failed to provide "don't know" or "unsure" answer choices for the survey questions. However, the omission of a "don't know" option for closed-ended questions simply required respondents to think through the answers thoroughly and avoid the easier "don't know" option. If anything, this results in more thoughtful and reliable data. Further, participants were not "forced" to answer all of the survey questions as Defendants incorrectly suggest. Instead, respondents had the option to skip several of the open-ended questions if they were unsure of the answer or the answer choices did not apply to them. *See* Marron Decl. ¶ 7, Ex. 6 [Belch Dep. Tr. at 74:1-20].

Lastly, Defendants criticize Dr. Belch for getting calculations wrong. There were *two* variables mentioned in Dr. Belch's Report that were not statistically significant, and Dr. Belch agreed to making a mistake due to "read[ing] the wrong table in [his] computer printout." Marron Decl., ¶ 7 & Ex. 6 [Belch Dep. Tr. 68:1-5]. Indeed, Dr. Belch submitted a Supplemental Report to correct these two errors. *See* Marron Decl. ¶ 5 & Ex. 4 [Belch Supplemental Expert Report]. While Dr. Belch agreed that these two variables need to be corrected in his report, these simple miscalculations, which did not affect his conclusions or opinion, are not a basis to exclude a Report. Further, if Defendants so wish, they will have a full opportunity to cross-examine Dr. Belch at trial regarding these two variables.

### 4.   Dr. Belch's Conclusions Are Helpful to the Trier of Fact

Defendants argue that while Dr. Belch used $3.49 as the price of the Product in his survey, this is not the actual average price of the Product. This is not a material

critique of Dr. Belch's survey methodology. Dr. Belch explained during his deposition that "anytime you do some type of price elasticity studies – price elasticity operates in a range." *See* Marron Decl. ¶ 7 & Ex. 6 [Belch Dep. Tr. 95: 6-8]. No matter what exact price point was used in the survey, as long as that price is within a reasonable range from the actual price a percentage-based extrapolation from the selected price is valid to reveal the willingness to pay for every price point within that range. *See id.* at 95:2-5.

Finally, Defendants base an argument on their premise that Dr. Belch's Question 34 asked "whether discovering a product was falsely advertised would affect their subjective evaluation of the Product." Mot. at 25:9-11. This, however, is inaccurate. This question actually asks, "The package states that Lay's Salt & Vinegar chips have *no* artificial flavors. If Lay's Salt & Vinegar chips *did contain* artificial flavors, would this have an influence on the price you would be willing to pay for this product?" Defendants characterize this as a "question about betrayal." Mot. at 24:4-5 *et seq*. This kind of florid exaggeration, which is endemic to Defendants' Motion, only serves to demonstrate that Defendants have no valid factual or legal arguments for exclusion. The survey question neither states nor implies that consumers have been "lied to" as Defendants suggest. Instead, depending on the group (test or control), the question referred to the Product packaging seen by that group and simply asks if the presence of artificial flavors in the Product would influence the price the respondent was willing to pay. Defendants base their argument here entirely on a subjective and unrealistic assumption about what Question 34 asks – an argument which lacks plausibility as it is untethered to the question the survey actually asked.

Defendants' Motion to Exclude Dr. Belch's testimony is lacking in relevant grounds as it argues for exclusion based either on fanciful exaggeration, misinterpretation of facts, or on issues of weight rather than admissibility, and fails to show any other good cause for granting Defendants' motion.

**C. Defendants' Critiques of Charlene Podlipna's Report Are Similarly Concocted Out of Counter-Factual Assumptions and Are Legally Meritless.**

      1.    <u>Ms. Podlipna's Opinions Are Procedurally and Scientifically Sound and Independent and are Based on Well-Accepted Economic Methodology</u>

Defendants argue, once again counter-factually, that Charlene Podlipna "brought no expertise to bear on this case." Mot. at 25:23-24. Ms. Podlipna, a shareholder in a prestigious economics consultancy, has over 18 years of increasingly responsible and impressive professional experience in the field. She is a Certified Public Accountant and is professionally certified in Financial Forensics as well. *See* Marron Decl., ¶ 8 & Ex. 7 [Podlipna Expert Report ¶¶ 2-3]. Ms. Podlipna is the Treasurer of CalCPA's Forensic Services, Economic Damages Section for the 2016-2018 term. Her testimony as an expert economist has been admitted by nine federal and state courts and in four formal arbitrations -- in all but two of those as a defense expert. *See* Marron Decl., ¶ 8 & Ex. 7 [Podlipna Expert Report ¶ 4]. To suggest, as Defendants do here, that Ms. Podlipna "brought no expertise" to this case would be professionally insulting if it were not entirely absurd.

      2.    <u>Defendants Ignore Two Out Of Three Independent Case Analyses Performed and the Resulting Conclusions Provided By Ms. Podlipna In Order to Claim That Her Report is Somehow Incomplete</u>

Defendants argue strenuously that Ms. Podlipna simply adopted Dr. Belch's conclusions and performed no original analysis. This is not correct. Defendants ignore two of the three case analyses Podlipna performed. *See* Marron Decl. ¶ 8, Ex. 7 [Podlipna Report]. Ms. Podlipna not only calculated a damages model based on Dr. Belch's conclusions but also on two additional methods supported by Dr. Belch's survey data that Dr. Belch did not. Ms. Podlipna examined the data produced by Dr. Belch's survey – which Defendants claim she did not do – and provided independent analysis producing two alternative damage models based on that data. *Id*. In addition, Ms. Podlipna examined sales data and profits produced by Defendants in this litigation. See Marron

1   Decl., ¶ 9 & Ex. 8 [Podlipna Dep. Tr. 24:4-16; 63:10-18]. Defendants' contention that
2   Ms. Podlipna did 'no original work' is simply false.

3       3.   *Defendants' "Supply-Side" Damages Model Argument is Simply An Argument In*
4           *Favor Of A Damages Model Defendants Prefer*

5       Defendants also make much about the supposed absence of "supply side" "facts"
6   and calculations. So-called "supply side" damages models are another tactic Defendants
7   attempt to bring to bear to argue against Plaintiffs' damages model– which once again,
8   goes to weight and not admissibility. In this case, Plaintiffs are seeking restitution
9   damages. Restitution damages are based on the difference in value between what the
10  consumer was promised and the product that was actually delivered to the consumer. In
11  this case, the Products promised "No Artificial Flavors", both explicitly and by omission
12  of the federal- and state-required front-label disclosures.

13      The willingness-to-pay survey performed by Dr. Belch sought and provided a
14  measure of that difference in value between the Product as advertised and the Product
15  actually delivered. Whether or not the Defendant sees any price elasticity ("supply side
16  factors") is, in this case, not germane to this question. Consumers see additional value in
17  natural products, as Dr. Belch's survey disclosed, the value to the consumer of an
18  artificially-flavored food product is less than that of a naturally-flavored product. *See*
19  Marron Decl. ¶ 4, Ex. 3 [Belch Expert Report]. This is true independent of whether the
20  manufacturer can raise the price of the product in the marketplace – the "supply-side"
21  analysis that Defendants wish to impose. The cases Defendants cite are not dispositive
22  on this point as they are easily distinguishable on both the facts and law.

23      For example, Defendants rely on *Apple v. Samsung*, No. 11-CV-01846-LHK,
24  2014 U.S. Dist. LEXIS 29721, at *82 (N.D. Cal. Mar. 6, 2014). In that case, however,
25  the parties' dispute was over the value of product features in products that were not yet
26  on the market and had no known market price. *Id*. The *Apple* court found that "[the
27  expert's] survey does not provide a way to directly compare consumers' willingness to
28  pay for particular features to the overall value of the infringing devices[,]" *id*. at 78-79,

because the "survey measures the market demand for the patented features in a vacuum, without relation to the actual price or value of the devices." *Id*. In that circumstance – a patent infringement case for a not-yet-marketed product -- supply-side factors actually were important because no one knew at what price the allegedly infringing product would be sold – there was no "market price" available for comparison. *Id*.

Here, the parties already know or can readily calculate the market price of all of the existing allegedly unlawful Products. This is the opposite of *Apple*, where no market price data was available and so "supply side" factors needed to be included in the expert's price-premium calculation. *Id. Zakariah* is not to the contrary. *Zakaria v. Gerber Prods. Co*., 2018 U.S. App. LEXIS 32240 (9th Cir. 2018). In *Zakariah*, the defendant had marketed versions of the product that were allegedly unlawfully labeled and versions that had lawful labels. *Id*. Here, the Defendants never offered any of the Products with labels that conform to federal or California law -- all versions of the Products in every size and label variation are illegally offered for sale in California. There is accordingly no lawfully-marketed version available for price comparison. Here, Dr. Belch's market survey based on consumers' willingness to pay provides useful price premium information to the trier of fact, unlike that in *Zakariah*. *Id*.

Defendants' contention that "supply side" factors are missing from the plaintiffs' damages model is based on inapposite cases and is simply inapplicable here. Defendants' argument about "challenged label statements" is disingenuous:  the plaintiffs do not argue merely that Defendants placed misleading statements on their labels as in *Zakariah*; the more fundamental problem is that Defendants were <u>required</u> to prominently disclose to consumers legally-required information that they withheld. *See generally* FAC. Had consumers been aware that the Product was artificially flavored, as Dr. Belch's survey shows, the Product would have been worth less to consumers than the price consumers paid for it. This makes objective sense as well. Food manufacturers use artificial flavors because they save the manufacturer money – artificial flavors cost less than natural flavors and artificially flavored foods therefore simply cost the

manufacturer less to make. The Product as it was delivered to consumers was worth less than as advertised, and Dr. Belch's survey provides the trier of fact with useful information in valuing and quantifying that difference. *See* Marron Decl. ¶ 4, Ex. 3 [Belch Expert Report]. Ms. Podlipna's decision not to apply Defendants' "supply side" factors here is methodologically as well as logically appropriate to this case. In addition, Ms. Podlipna implicitly addresses supply side factors by relying upon Defendants' actual sales data. *See Hilsley v. Ocean Spray Cranberries, Inc.*, No. 17CV2335-GPC(MDD), 2018 WL 6300479, at *16 (S.D. Cal. Nov. 29, 2018) ("Defendants' argument that Plaintiff's demand-side model fails to account for real world market conditions and is based on hypotheticals is without merit.").

> ### 4. *Ms. Podlipna's Factual Assumption That All of The Products During The Proposed Class Period Were Labeled Unlawfully Is Correct*

Defendants argue that Ms. Podlipna used the "*wrong dataset*" [italics in the original] because her calculations assumed - correctly - that the Product packaging was misleading and unlawful under California law throughout the Class Period. Mot. at 32:20-33:14. Ms. Podlipna's assumption is correct; Defendants' is not. At no time during the proposed Class Period did any Product package include the federally-required disclosure that the Product was "Artificially Flavored" or contained artificial flavors, either on the front-of-package display panel or in the ingredient list. Both disclosures are required under federal and California law. *See* Code of Federal Regulations 21 C.F.R. § 101.22; *See* Cal. Health & Safety Code §§ 109875, *et seq.*, ("Sherman Law").  As Defendants' Motion itself concedes, such a disclosure is of critical importance to consumers – Defendants admit that a Product package design that correctly and prominently discloses the presence of artificial flavors is, according to Defendants' expert and Defendants, "not commercially viable." *See* Marron Decl. ¶ 7, Ex. 6, [Belch Dep. Tr. at 122-125]. The only plausible reason such a design would be "not commercially viable" is if, as Defendants themselves concede, a significant number of consumers would reject the product if it prominently and lawfully disclosed the presence

1  of artificial flavors.

2      Defendants skewer their argument on their own sword. If Defendants argue that a

3  prominent disclosure of artificial flavors would render their Product "not commercially

4  viable" they cannot then turn around and argue that the same disclosure would have no

5  effect on price or sales. *Id*. Defendants' argument to exclude Ms. Podlipna's testimony

6  fails based on Defendants' own argument. Similarly, Defendants' arguments to exclude

7  the testimony of Plaintiffs' two other experts, Drs. Belch and Somogyi, are also without

8  merit as these are either factually inaccurate or go exclusively to the weight of their

9  testimony and not to their admissibility. *See Ruiz*, 2017 WL 2263046, at *2.

## IV.   CONCLUSION

11     For the foregoing reasons, Defendants' Motion to Exclude Expert Testimony

12  should be denied.

13

14  Dated: March 7, 2019            Respectfully Submitted,

15

16

17                                 */s/ Ronald A. Marron*
                                   RONALD A. MARRON

18

19                                 **LAW OFFICES OF RONALD A. MARRON**
                                   RONALD A. MARRON (SBN 175650)
20                                 ron@consumersadvocates.com
                                   ALEXIS M. WOOD (SBN 270200)
21                                 alexis@consumersadvocates.com
                                   KAS L. GALLUCCI (SBN 288709)
22                                 kas@consumersadvocates.com
                                   MICHAEL T. HOUCHIN (SBN 305541)
23                                 mike@consumersadvocates.com
                                   LILACH HALPERIN (SBN 323202)
24                                 lilach@consumersadvocates.com
                                   651 Arroyo Drive
25                                 San Diego, California 92103
                                   Telephone: (619) 696-9006
26                                 Facsimile: (619) 564-6665

27                                 **LAW OFFICE OF DAVID ELLIOT**
                                   DAVID ELLIOT (SBN 270381)
28                                 davidelliot@elliotlawfirm.com

2028 3rd Avenue
San Diego, CA 92101
Telephone: (858) 228-7997
**Attorneys for Plaintiffs and the Proposed Class**

*Allred v. Frito-Lay North America, Inc., et al.,* Case No. 3:17-cv-01345-JLS-BGS
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY